**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| Le'BRAYYA MANZUR, | * |
| Plaintiff, | * |
|  | * |
| v. | Case No.: PWG-14-2268 |
|  | * |
| DANESHA DANEY, *et al.*, | * |
| Defendants. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Pending before the Court is Defendants' Second Motion for Summary Judgment in a 42 U.S.C. § 1983 action in which Plaintiff Le'Brayya Manzur alleges that correctional officers at the Maryland Correctional Institute for Women ("MCI-W") violated her Eighth Amendment rights by using excessive force against her and by showing deliberate indifference to her serious medical need when they delayed seeking treatment for her broken arm. ECF No. 69. The Motion is fully briefed. Defs.' Mem., ECF No. 69-1; Pl.'s Opp'n, ECF No. 72; Defs.' Reply, ECF No. 78. No hearing is necessary. Loc. R. 105.6 (D. Md.). Genuine disputes of material fact preclude me from finding that qualified immunity shields Defendant Danisha Daney from liability with respect to Manzur's excessive-use-of-force claim (Count I); however, as Manzur has failed to demonstrate that delayed treatment of her broken arm resulted in any additional harm, I will grant summary judgment as to her deliberate-indifference claim (Count II). Additionally, Manzur has failed to plead compliance with the Maryland Tort Claims Act's notice requirements, so I will grant Defendants' Motion as to her battery claim (Count III).

**Background**

On the morning of April 23, 2016, three MCI-W correctional officers, Defendants Sgt. Danisha Daney, CO II Tara Barris-Stewart, and CO II Krissie Battle, were escorting inmates housed in disciplinary segregation to showers. Daney Decl. 1, J.A. 628; Battle Decl. 1, J.A. 631; Barris-Stewart Decl. 1, Defs.' Mot. Dismiss Ex. 3, ECF No. 8-5.[1]  Around 9:00 A.M., the officers approached cell 312, in which Manzur and her cellmate, Felicia Sheridan, resided. Following MCI-W procedures for escorting prisoners in disciplinary segregation, Barris-Stewart applied handcuffs to Manzur through a slot at the bottom of the cell door.  Joint Statement of Facts ¶¶ 5–7, 11, ECF No. 69-2 [hereinafter Joint Statement].  Manzur complained that her handcuffs were too tight.  *Id.* ¶ 12.  Daney told Manzur to stop complaining, and Manzur talked back to her, leading Daney to revoke Manzur's shower privileges for that day.  Manzur Dep. 36:20–37:20, J.A. 10; Daney Dep. 63:6–17, J.A. 87.  Upset that she would not be able to shower, Manzur refused to comply with Daney's order to return her handcuffs.  Manzur Dep. 37:18–19, J.A. 10. Daney radioed the prison control center to request that cell 312's door be electronically unlocked.  Joint Statement ¶ 14.

What happened next is a subject of dispute.  Manzur and Sheridan contend that Daney pushed Manzur while she was still cuffed, and caused her to trip over a cardboard box and fall to the floor.  Manzur Dep. 38:1–2, 44:12–20, J.A. 11; Sheridan Dep. 23:4–5; 30:8–18, J.A. 406; Sheridan Decl., J.A. 632.[2]  By Manzur's account, Daney was enraged by Manzur's use of

---

[1] Citations to J.A. refer to the Joint Appendix that the parties submitted in the case, which appears at ECF No. 79-1 to -34.

[2]   Defendants object to inclusion of Sheridan's Declaration in the summary-judgment materials.  ECF No. 79-25.  When a court determines whether evidence is admissible at the summary-judgment stage, "[t]he relevant question is not the admissibility of the evidence's current form but whether it can be presented in an admissible form at trial."  Steven S. Gensler, 2

profanity towards her, and Daney pushed Manzur as soon as the door opened.  Manzur Dep.

37:18–38:2, 44:12–15, J.A. 10, 12.  Sheridan's recollection is that Manzur took two steps outside

of the cell before Daney pushed her.  Sheridan Dep. 20:12–30:8, J.A. 405–06.  Daney and the

other correctional officers aver that Manzur was advancing towards the cell door in a manner

that suggests that she was trying to exit the cell (but had not yet exited the cell) and that Daney

extended her hand, telling Manzur to back up, but did not touch her.  Daney Dep. 68:10–15,

69:7–70:20, J.A. 88–89; Barris-Stewart Dep. 104:5–9, J.A. 186; Battle Dep. 97:14–98:9, J.A.

259–60; Daney Decl. 2, J.A. 629; Battle Decl., J.A. 631; Barris-Stewart Decl.  But none of the

correctional officers believe that Manzur posed a threat to Daney.  Daney Dep. 104:3–14, J.A.

97; Barris-Stewart Dep. 183:7–13, 184:8–10, J.A. 206; Battle Dep. 112:1–113–2, J.A. 263.

According to Daney and Barris-Stewart, Manzur tripped over the cardboard box as she backed

---

Federal Rules of Civil Procedure, Rules & Commentary, R. 56 (West 2017).  As Sheridan could
testify at trial, I will consider her Declaration at the summary-judgment stage.

Defendants also object that the declaration is "not a sworn statement made under oath."
ECF No. 79-25.  While unsworn declarations may be considered at the summary-judgement
stage, they must be submitted under penalty of perjury.  Fed. R. Civ. P. 56(c)(4); 28 U.S.C.
§ 1746.  Sheridan's Declaration is unsworn and contains no certification that it was submitted
under penalty of perjury, but it was submitted on an official Maryland Division of Correction
form, was witnessed by Officer Wilson, and contains a certification that the statement "was
given voluntarily and is true and correct to the best of [the declarant's] knowledge and belief."
Sheridan Decl.  The Maryland Department of Corrections could easily have included on its form
a certification that the statement was made under penalty of perjury using the language provided
in 28 U.S.C. § 1746.  It would be contrary to the spirit if not the letter of Fed. R. Civ. P. 56 and
28 U.S.C. § 1746 for me to refuse to consider statements secured by the Maryland Department of
Corrections as part of its internal investigation due the Department's failure to include the
necessary certification on its own form.  Accordingly, I will consider Sheridan's Declaration.

But even if I disregarded Sheridan's written statement, it would not change the result, as
what she said in her statement is largely duplicative of what she testified to during her
deposition.  *Compare* Sheridan Dep. 21:19–23:13, J.A. 403–04, *with* Sheridan Decl., J.A. 632.
And, I note that Sheridan's Inmate Statement is part of the Maryland Department of Correction's
official report of the incident, which is admissible as an exception to the hearsay rule under Fed.
R. Evid. 803(8)(A), and Defendants have failed to demonstrate that the source or circumstances
of the making of the report lack trustworthiness, Fed. R. Evid. 803(8)(B).

Defendants make similar objections to other declarations in the record that are similarly
unavailing.  *See* ECF Nos. 79-26 to -27.

up.  Daney Dep. 70:21–71:5, J.A. 89; Barris-Stewart Dep. 107:11–18, J.A. 187; Daney Decl. 2,

J.A. 629, Barris-Stewart Decl.   Whatever caused the fall, the impact fractured Manzur's left

humerus.  Joint Statement ¶ 15.

The parties also dispute how Manzur reacted after she broke her arm.  Daney contends

that, despite being handcuffed behind the back and suffering from a broken left arm, Manzur

immediately attempted to stand up and gave no indication that she had been injured.  Daney Dep.

71:13–72:6, J.A. 89.   Barris-Stewart also testified at her deposition that Manzur immediately

stood up, but she acknowledges that Manzur began "screaming" about her arm.  Barris-Stewart

Dep. 110:18–22, J.A. 188.  Battle cannot recall whether or not Manzur ever gave any indication

that her arm was injured.  Battle Dep. 114:5–115:8, J.A. 264.  Manzur testified at her deposition

that she began screaming in pain as soon as she fell to the floor and specifically told the officers

that her arm was broken.  Manzur Dep. 52:16–54:10, J.A. 14–15.  She also contends that she did

not stand up immediately but that the officers left her laying on the floor and that she eventually

was able to stand up by using the cell's toilet to support her body's weight, given that her one

functional arm was handcuffed behind her back.  *Id.* at 59:12–61:15, J.A. 16.  Statements from

other inmates indicate that Manzur could be heard screaming throughout the C-Wing during and

after the incident and yelling that her arm was broken. Fulcher Decl., J.A. 633; Downs Decl.,

J.A. 634.

Whatever Manzur's immediate reaction to the injury, the officers did not seek medical

assistance until at least several minutes after the incident, at which time Daney contacted Lt.

Wayne Shareef, who gave permission for Manzur to be taken to the prison infirmary.[3]  Daney

---

[3] The precise gap between Manzur's injury and Daney's call to Lt. Shareef is unclear.  Prison records indicate that the incident occurred at 9:00 A.M.   192 C-Wing Logbook, J.A. 615. Manzur estimates that it occurred between 9:00 A.M. and 9:15 A.M, Manzur Dep. 111:7–8, J.A.

Dep. 78:2–9, J.A. 91.   But the officers did not escort Manzur to the infirmary until at least 10:00

A.M. and perhaps as late as 10:50 A.M.[4]   Daney contends that a mass movement of general-

population inmates for lunch accounted for the delay, because prison policies prohibit movement

of inmates on disciplinary segregation until hallways are clear of other inmates for safety

reasons.   Daney Dep. 78:19–21, 148:8–16, 158:4–159:1, J.A. 90, 108, 111.

Once at the infirmary, the medical staff determined that Daney had suffered a fractured

humerus, ordered an x-ray onsite, prescribed pain killers, and then transferred her around 12:30

P.M. by Department of Corrections van to Bon Secours Hospital, where she underwent surgery.

Medical Records 2–3, Defs.' Mot. to Dismiss Ex. 6, ECF No. 8-8; Joint Statement ¶¶ 18–22;

Manzur Dep. 111:9, J.A. 29.   Manzur contends that Defendant Cpt. James Webb delayed her

transfer to Bon Secours and subsequent treatment by insisting upon an onsite x-ray when the

medical staff was prepared to transfer her without one and by insisting that she be taken to the

hospital by van, which was not immediately available, instead of by ambulance.   Manzur Dep.

100:4–6, 101:15–102:7, 110:13–18, J.A. 26–27, 29.   Medical records indicate that the onsite

x-ray and van transfer were approved by physician's assistant Emebet Negash, Medical Records

2–3, and Webb testified in his deposition that it was the medical staff's decision, without his

input, to order an on-site x-ray.   Webb Dep. 94:5–8, J.A. 321; *see id.* 95:16–96:19, J.A. 321

(indicating that he was told that Manzur would be transported by van and speculating that the

---

29.   Daney estimates that she called Lt. Shareef between 9:15 and 9:20.   Daney Dep. 78:6–9, J.A.
91.

[4]   A non-contemporaneous entry in the C-Wing Logbook indicates that Barris-Stewart took
Manzur to the infirmary at 10:00 A.M. 192 C-Wing Logbook, J.A. 616.   But Manzur contends
that the infirmary log indicates that they arrived there at 10:50 A.M.   Pl.'s Opp'n 6.   I find the
infirmary log illegible and can only say with certainty that she arrived after 10:00 A.M.
Dispensary Log, J.A. 365.   (Despite citing to the log in her Opposition, Manzur objects to
admission of the log for summary-judgment purposes because it is not the complete writing or
the original document.   Because the log can be submitted in an admissible form at trial, I will
consider it.)

duty lieutenant had arranged the transportation).  Despite the surgery, Manzur currently lacks a full range of motion in her left arm.  Independent Medical Evaluation 6, J.A. 483.

## **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## **Discussion**

## Exhaustion

Defendants previously moved to dismiss, or, in the alternative, for summary judgment on the grounds that Manzur (1) did not exhaust the administrative remedies available to her, as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a); and (2) failed to allege facts that could establish violations of her Eighth Amendment rights.  Defs.' Mem. Supp. First Mot. Summ. J. 8–19, ECF No. 8-1.  I construed the motion as a Motion for Summary

Judgment, which I denied.  Mem. Op. 2, ECF No. 17.  With respect to the exhaustion argument, I specifically held that Manzur had exhausted her administrative remedies because the Department of Public Safety and Correction Services' Internal Investigations Unit ("IIU") initiated an investigation into the incident, a procedure that terminates the administrative remedies process for the events subject to investigation.  *Id.* at 5.  Defendants suggest that the Supreme Court's recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), demands a contrary outcome.  Defs.' Mem. 16–17.  But *Ross* is inapposite.  That case held that the PLRA permits no "special circumstances" exception to the statute's exhaustion requirement.  *Ross*, 136 S. Ct. at 1858.  I did not excuse non-exhaustion but rather held that Manzur *had* exhausted her administrative remedies.  Mem. Op. 5.  Defendants also attempt to re-argue that an IIU investigation does not exhaust administrative remedies.  Defs.' Reply 3–7.  I already rejected that argument, and the issue is not open to re-litigation.  I reiterate: Manzur has exhausted her administrative remedies.

## Qualified Immunity

Defendants also argue that they are entitled to summary judgment on the federal claims because qualified immunity shields them from liability.  Defs.' Mem. 19–27.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Summary judgment should be denied on a qualified immunity claim if (1) there is sufficient evidence to establish a genuine issue of material fact on whether the government official violated one of the plaintiff's federally protected rights; and (2) the right at issue was "clearly established" at the time of the events in question. *See id.* at 232.  Defendants primarily argue that the evidence is not sufficient to

establish that Daney used excessive force against Manzur or that Defendants were responsible for unreasonable delay in Manzur receiving medical care.

A. <u>Excessive Force</u>

Defendants argue that they are entitled to summary judgment on Manzur's excessive-force claim against Daney. Defs.' Mem. 20–23. Excessive-force claims are analyzed as possible violations of the Eighth Amendment's prohibition on cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Hudson v. McMillian*, 503 U.S. 1, 5–7 (1992). The "unnecessary and wanton infliction of pain" by a correctional officer violates the Eighth Amendment. *Hudson*, 503 U.S. at 5. The "core judicial inquiry" for such an Eighth Amendment claim is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6–7. To answer this question, courts look to "the extent of injury suffered by an inmate," "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' " *Id.* at 7 (quoting *Whitley*, 475 U.S. at 321). In addition to showing that the officer acted maliciously, a party asserting an Eighth Amendment excessive-force claim must also demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9).

The record here contains evidence supporting strikingly different accounts of the incident at Manzur and Sheridan's cell. But two things are undisputed: first, Manzur suffered a serious injury, *see* Joint Statement ¶ 15, and second, that Manzur posed no threat to Daney or either of the other two correctional officers at her cell at the time of the incident, Barris-Stewart Dep.

183:7–13, 184:8–10, J.A. 206; Battle Dep. 112:1–113–2, J.A. 263; *see also* Daney Dep. 104:3–14, J.A. 97 (stating that she did not act in self-defense).   The correctional officers contend that Daney used no force at all against Manzur, but only extended her hand and told Manzur to back up.   Daney Dep. 70:13–71:1, J.A. 89; Barris-Stewart Dep. 104:5–9, J.A. 186; Battle Dep. 97:14–98:9, J.A. 259–60.   By contrast, Manzur and Sheridan both testified at their depositions that Daney violently pushed Manzur.   Manzur Dep. 37:18–38:2, 44:12–15, J.A. 10–12; Sheridan Dep. 30:8–18, J.A. 406.[5]   Defendants argue that force, if it was used, would have been justified because Manzur was attempting to exit the cell without authorization.   Defs.' Mem. 22.   But Manzur testified at her deposition that Daney pushed her as soon as the cell door opened in retaliation for Manzur's use of profanity towards her.   Manzur Dep. 37:18–38:2, 44:12–15.   I cannot on the record before me determine whether or not Daney used force against Manzur, the degree of force (if any) that Daney exerted, or if any force that was used was calculated to restore discipline rather than to inflict pain.   I will therefore deny summary judgment on the excessive-use-of-force claim.

### B.   Denial of Medical Care

Defendants also argue that they are entitled summary judgment on Manzur's claims for denial of medical care.   Defs.' Mem. 23–27.   "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion)).   A deliberate-indifference claim requires proof that (1) the prisoner objectively suffered from a serious medical need; and (2) that prison officials were

---

[5] Defendants discount Sheridan's deposition testimony by noting that Manzur promised to share any award she receives with her.   Defs.' Mem. 10.   Defendants may certainly attempt to use this evidence to impeach Sheridan's testimony at trial, but I must still consider Sheridan's deposition testimony in determining whether summary judgment is appropriate.

subjectively deliberately indifferent to that need. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). The claim's subjective component requires proof that prison personnel "act[ed] recklessly [by] 'consciously disregard[ding]' a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

"[D]eliberate indifference can be displayed . . . through the response of . . . institutional personnel to an inmate's medical needs, including ignoring an inmate's serious condition or delaying medically necessary treatment." *Abraham v. McDonald*, 493 F. App'x 465, 466 (4th Cir. 2012) (per curiam) (citing *Estelle*, 429 U.S. at 105–06). But an Eighth Amendment violation based on delayed treatment "only occurs . . . if the delay results in some substantial harm to the patient." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). Delay-related harm can be demonstrated through evidence that the delay "exacerbated [the inmate's] injury or prolonged his pain." *McDonald v. Maryland Dept. of Pub. Safety & Corr. Servs.*, No. GLR-14-2291, 2016 WL 795969, at *4 (D. Md. Feb. 29, 2016).

At the outset, I will say that a finder of fact (which I am not at this stage of the proceedings) could easily find the correctional officers' account of what took place after Manzur fell incredible. By Daney and Barris-Stewart's account, Manzur either stood up or attempted to stand up immediately after the fall with her dominant arm fractured and with her hands handcuffed behind her back. *See* Daney Dep. 71:13–17, J.A. 89; Barris-Stewart Dep. 110:21, J.A. 188. Daney contends that Manzur accomplished this feat in silence, Daney Dep. 72:3–6 ("Q. Did she say anything? A. Not at that time, no. Q. She didn't say anything? A. No."), while Battle cannot recall if Manzur had an audible reaction to her injury, Battle Dep. 114:5–115:8, J.A. 264. It strains credulity to suggest that an individual could summon the stoicism to rise to her feet under such conditions and in a manner that gave the correctional officers no inkling that

she had suffered a serious injury.  There is also considerable reason to doubt Daney's proffered

reason for additional delay after the correctional officers became aware of the injury—the mass

movement of general population prisoners.  Daney Dep. 78:19–21, 148:8–16, 158:4–159:1, J.A.

90, 108, 111.   Cpt. Webb testified at his deposition that MCI-W policy dictates, without

exception, that inmate movement cease in the prison when the infirmary indicates that it is ready

to treat a prisoner.  Webb Dep. 78:14–10, 80:19–81:3, 82:8–10, J.A. 317–18.  Accordingly, I find

that Defendants have failed to persuasively account for the delay in administration of treatment

to Manzur.

     That said, although the timeline is far from clear, at most, one-hour-and-fifty minutes

elapsed between Manzur's injury and the initiation of her treatment in the prison infirmary.  *See*

192 C-Wing Logbook, J.A. 615 (indicating that injury occurred at 9:00 A.M.); Dispensary Log,

J.A. 365 (illegible entry indicating that Manzur arrived at infirmary after 10:00 A.M. and perhaps

as late as 10:50 A.M.).  The record contains no evidence that Manzur suffered additional harm,

and certainly not "substantial harm" from this delay.  *See Webb*, 281 F. App'x at 166.  Dr.

Richard Conant performed an independent medical evaluation in March 2016 and concluded that

Manzur "had reached maximum medical improvement, with fracture healing in satisfactory

position and alignment."  Independent Medical Evaluation 6, J.A. 483.  According to Dr. Conant,

this means that the Manzur's humerus is "anatomically restored" and "not crooked or out of

place" and that the surgery did not result in "malunion or non-union" of the bone.  Conant Dep.

56:15–17, J.A. 516.   Thus, the bone "is healed in a position and alignment that would be

satisfactory for functional restoration of that bone."  *Id.* at 56:17–19, J.A. 516.  But Dr. Conant

also concluded that Manzur suffers "permanent restrictions of shoulder motion, most likely on

the basis of residual adhesive capsulitis from the injury."  Independent Medical Evaluation 6,

J.A. 483.   He characterizes this symptom as "a not unusual residual of an injury about the shoulder joint" that occurred because the fracture caused "some element of injury to the supporting structures of the shoulder" which was "further aggravated by an element disuse because [a surgically repaired bone is] painful to use [for] a certain period." Conant Dep. 60:5–6**,** 65:8–11, J.A. 517–18.   Dr. Conant's report and deposition testimony are devoid of any indication that delayed treatment caused the limitations that Manzur is currently experiencing.   *See generally* Independent Medical Evaluation, J.A. 479–483; Conant Dep., J.A. 502–49.   The record lacks any evidence from which I can infer that Daney, Barris-Stewart, or Battle were deliberately indifferent towards Manzur's medical needs, much less that they violated her clearly established federal rights, even if they were responsible for a one-hour-and-fifty-minute delay in her treatment.

For similar reasons, a deliberate-indifference claim cannot be sustained against Webb. Although Manzur asserts that Webb further delayed her treatment by insisting that she receive an x-ray at the prison infirmary and take a prison van to the hospital rather than an ambulance, Manzur Dep. 100:4–6, 101:15–102:7, 110:13–18, J.A. 26–27, 29, prison records demonstrate that medical personnel approved these decisions, Medical Records 2–3.   Even if Webb expressed his preference for an x-ray to be administered onsite or for a prison van to be utilized instead of an ambulance, Manzur has not produced any evidence that Webb overrode what the infirmary personnel believed to be a medically necessary course of treatment.   Moreover, Manzur acknowledges that that she ultimately received further treatment at Bon Secours Hospital by 12:30 P.M.   Manzur Dep. 111:9, J.A. 29.   And, again, Dr. Conant's independent medical evaluation and deposition testimony contains no suggestion that that another one-to-two-hour delay caused "substantial harm."   *See Webb*, 281 F. App'x at 166; Independent Medical

Evaluation, J.A. 479–483; Conant Dep., J.A. 502–49. The record contains no evidence from which I can infer that Webb violated Manzur's clearly established federal rights.

Battery Claim (Count III)

Count III of Manzur's Amended Complaint alleges that Defendant Daney committed the intentional tort of battery. Am. Compl. ¶¶ 55–57. Defendants argue that this claim fails because Manzur has not pleaded compliance with the Maryland Tort Claims Act, Md. Code. Ann., State Gov't § 12-101 to -110, which sets forth the rules governing tort claims against the State of Maryland or its employees. Defs.' Mem. 28. Manzur initially sought to strike this argument from Defendants' Memorandum in support of their motion because they did not raise the issue in their letter seeking permission to file a motion for summary judgment. Pl.'s Ltr., 1–2, ECF No. 73. I denied Manzur's request but permitted her to request permission to file a sur-reply to further address the issue. Nov. 30, 2017 Paperless Order, ECF No. 76. Although Defendants' initially cited irrelevant authority to support their argument, Defs.' Mem. 28, their Reply supports the argument with applicable authority, Defs.' Reply 21; *see also* Md. Code Ann., State Gov't § 12-106(b). Manzur never requested permission to file a sur-reply, and since she never responded to the substance of Defendants' argument on this point, *see* Pl.'s Opp'n 40, I will grant Defendant's Motion as unopposed as to Count III of the Amended Complaint.[6]

**Conclusion**

In sum, genuine disputes of material fact preclude me from granting summary judgment with respect to Manzur's excessive-use-of-force claim (Count I) on qualified-immunity grounds. But Manzur has failed to provide evidence from which I can conclude that any MCI-W personnel delayed her medical treatment in a manner that was deliberately indifferent, and

---

[6] Moreover, the record contains unrebutted evidence that Manzur failed to comply with the statute's notice requirements. *See* Miller Decl. ¶ 7, J.A. 477–78.

Manzur's battery claim fails because she did not comply with the Maryland Tort Claims Act. Accordingly, I will grant Defendants' Motion in part and deny it in part.  I will enter judgment in favor of the Defendants on Counts II and III of the Amended Complaint.  Because the sole remaining count pertains only to Danisha Daney, I will dismiss the other Defendants from the case.

A separate Order follows.


Dated: <u>March 9, 2017</u>                              <u>          /S/          </u>
                                                                                  Paul W. Grimm
                                                                                  United States District Judge

jlb